**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

VERIZON ADVANCED DATA, INC.      :
et al.,

                        :      **Case No. 2:05-cv-955**

          **Plaintiffs,**

                        :      **Judge Holschuh**

    **v.**

                        :      **Magistrate Judge King**

FROGNET, INC. et al.,

                        :

          **Defendants.**

                        :

## MEMORANDUM OPINION AND ORDER

Before the Court now is the Motion for Summary Judgment (doc. 64) filed by the plaintiffs in this case, Verizon Advanced Data, Inc., Verizon Advanced Data-Virginia, Inc., and Verizon Select Services, Inc., on the counterclaims made by the defendants, FrogNet, Inc. and FrogNet DSL, Inc. (doc. 17). For the reasons stated below, the motion is granted in part and denied in part.

### I. Introduction

The parties in this case provide internet services to individual and commercial consumers. Insofar as this suit is concerned, internet services can be provided to consumers in either a retail or a wholesale model. In a retail model, a consumer must contract separately with an internet service provider ("ISP") for internet service and with a phone company for the DSL ("Digital Subscriber Line") phone lines over which that internet service will be carried. In a wholesale model, a consumer need only contract with the ISP for both the internet service and the DSL phone lines; the ISP then contracts directly with the phone company for the consumer's DSL phone lines and passes that cost on to the consumer. Defendants FrogNet, Inc. and FrogNet DSL, Inc. (collectively "FrogNet") are

1

internet service providers based in Athens, Ohio. Complaint, at ¶ 6. Plaintiffs provide DSL phone lines to FrogNet's customers. Compl., ¶ 4.

On June 19, 2001, two of the plaintiffs, Verizon Advanced Data, Inc. and Verizon Advanced Data-Virginia, Inc. (collectively "Verizon") entered into an Infospeed DSL Solutions Term and Volume Discount Program Purchase Agreement with FrogNet (hereinafter "agreement" or "wholesale agreement"). Id. at ¶ 8. The agreement called for Verizon to serve as a wholesale provider of internet services to FrogNet, who would then contract to provide these services to consumers. This marked a change for the parties, as FrogNet had used the retail model with Verizon exclusively up until that point.

The amount that FrogNet had to pay Verizon for the DSL phone lines depended on the rates set in a Tariff issued by the Federal Communications Commission ("ADSL Tariff"), which was incorporated into the agreement. See Agreement, § 2(A). These rates varied based on the number of customers FrogNet would commit itself to having at the end of each year. Specifically, the Tariff sets forth five different levels of pricing and customer commitments at which FrogNet could commit itself in the agreement; the higher the commitment, the lower the price:

| | Number of Customers FrogNet had to Sign-up | | | | | Monthly Product Rate | | |
|---|---|---|---|---|---|---|---|---|
| Level | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Prod. 1 | Prod. 2 | Prod. 3 |
| A | 125(C) | 375(C) | 625(C) | 1,250(C) | 2,500(C) | $34.50 | $38.50 | $43.50 |
| B | 2,500 | 7,500 | 22,500 | 37,500 | 50,000 | $33.95 | $37.95 | $42.95 |
| C | 5,000 | 15,000 | 45,000 | 75,000 | 100,000 | $32.95 | $36.95 | $41.95 |
| D | 25,000 | 75,000 | 225,000 | 375,000 | 500,000 | $31.95 | $35.95 | $40.95 |
| E | 50,000 | 150,000 | 450,000 | 750,000 | 1,000,000 | $29.95 | $33.95 | $38.95 |

Verizon Advanced Data, Inc. F.C.C. Tariff No. 1, § 5, Part III, ¶ 5.1.6(C). In the event that FrogNet

did not meet its required quota of customers at the end of a year, the agreement contained penalty provisions. FrogNet would be required to pay what was called a Shortfall Liability, and it would be reassigned to a lower commitment level. ADSL Tariff, § 5, Part III, ¶ 5.1.5(B). If it did not wish to be reassigned, however, it could opt to pay an Alternative Shortfall Liability instead. Id. (collectively, the Shortfall Liability and the option of either reassignment or Alternative Shortfall Liability are referred to, hereinafter, as the "penalty provisions").

FrogNet initially asked Verizon if it would sign an agreement in which FrogNet committed itself at the highest level—Level E—because Level E had the lowest pricing and FrogNet had heard that Verizon never enforced the penalty provisions, making Level E appear to be the best option. Verizon refused to sign with FrogNet at Level E, however, citing the low likelihood that FrogNet would meet Level E's customer commitment requirement of 50,000 customers, and because the resulting penalty would have a devastating effect on FrogNet's business. Instead, the agreement was signed with FrogNet at Level B, which only required FrogNet to sign up 2,500 customers in the first year. Agreement, doc. 1, exhibit A, ¶ 2(B). FrogNet decided to enter the agreement in part because it thought the pricing in the wholesale model, even at Level B, would be better than it was in the retail model. Deposition of Chip McIntosh, at 28–37, 51.

After entering the agreement, FrogNet found that the savings it had hoped to realize in the wholesale model were not materializing. A large reason for this, FrogNet claims, was that Verizon had refused to allow FrogNet to sign up at Level E, which would have given FrogNet better pricing for Verizon's services and thereby allowed FrogNet to lower its prices to consumers and, presumably, to sign up more customers as a result. At the same time, Verizon's fears about FrogNet's ability to meet the Level E customer requirements proved to be well grounded, as

FrogNet failed to meet even the 2,500 customer requirement of Level B at the end of the first year of the contract. McIntosh depo., at 106. Nonetheless, Verizon did not charge a Shortfall Liability to FrogNet at the end of the year; nor did it reassign FrogNet to Level A or require it to pay the Alternative Shortfall Liability. This, in turn, fueled FrogNet's belief that it should have been allowed to sign-up at Level E, because Verizon's practice of not enforcing the penalty provisions appeared to render its reasons for refusing to contract at Level E unsubstantiated. Id. at 39.

FrogNet also complains of what it believes to be misbillings by Verizon. Opp., at 3. These occurred quite regularly, according to FrogNet, and they came in the forms of overbilling existing accounts and continuing to bill accounts after they were disconnected, among others. Although FrogNet filed claims disputing those bills in the manner agreed upon with Verizon, Verizon has apparently never addressed those disputes to FrogNet's satisfaction. To make matters worse, sometime in the first few months of 2003, Verizon summarily dismissed every dispute FrogNet had filed in the course of updating the billing dispute system. McIntosh depo., at 401, 406–10.

The relationship between FrogNet and Verizon became even more complicated in late 2002 when Verizon informed FrogNet that it would no longer allow FrogNet to sign-up new customers in certain areas unless it made certain equipment upgrades. Up until that point, FrogNet had customers in its home Local Access and Transport Area ("LATA"), LATA 324, as well as in other LATAs in Ohio. But with this new policy, Verizon would not allow FrogNet to sign-up new customers in LATAs 325, 326, and 328 unless FrogNet agreed to establish a Point of Presence in those LATAs, which would have cost a large sum of money, some of which would have been used to purchase and rent equipment from Verizon. McIntosh depo., at 170–72. Although Verizon told FrogNet that this prohibition on providing intra-LATA service was based on federal law, it has never

4

identified that law. Id. at 170, 185. FrogNet chose not to establish a Point of Presence in any of those LATAs because it felt that the investment was too costly, especially given the unresolved billing disputes, and unfair, given that it believed the investments to have been unnecessary as a technical matter. Id. at 170–85.

As a result of these disputes, FrogNet decided to try to switch its wholesale customers back to the retail model. It had switched customers, both on an individual basis and in larger groups, back and forth in the past with little trouble, and when it requested to do so in early 2003, FrogNet's Verizon-representatives said it would be no problem. McIntosh depo., at 59–62. The customers were not migrated as promised, however, because Verizon's General Counsel, John Cullina, put a stop to the migration. When approached by FrogNet, Cullina informed FrogNet that it had two options to remedy the situation. First, it could pay all the money it owed Verizon on past bills, with the disputed portions of those bills going into an escrow account pending the resolution of the disputes, plus all Shortfall Liability it owed for failing to meet its first-year customer-commitment requirement and termination liability for terminating the agreement. The second option would be for FrogNet simply to give up its DSL customers. Id. at 80–85. FrogNet did not accept either option, so service to its customers was cut off. It was re-established a week later for those customers that were allowed to reconnect because they were in FrogNet's home LATA, but the customers in other LATAs were not allowed to reconnect because they were deemed to be "new" customers, barred from reconnecting by Verizon's prohibition on new intra-LATA customers. FrogNet claims it lost approximately 180 customers as a result of this.

The billing disputes continued for the next couple years, and Plaintiffs brought this suit on October 19, 2005, alleging breach of contract by FrogNet, account, and unjust enrichment. In sum, Plaintiffs are seeking $180,564.06 that they believe FrogNet owes on the agreement after it allegedly stopped paying for services in 2003. Plaintiffs have also alleged one count of defamation.

In response, FrogNet has brought counterclaims against all three plaintiffs, although it now stipulates that no counterclaims are alleged against Verizon Select Services, Inc. Doc. 17; FrogNet's Opposition to Motion for Summary Judgment, at 1. It alleges that Verizon breached the agreement when it refused to allow FrogNet to commit itself to Level E, and also when it refused to provide service to new FrogNet customers not located in FrogNet's home LATA. Doc. 17, ¶¶ 38–60. FrogNet also alleges that the intra-LATA dispute constitutes intentional interference with a business relationship, id. at ¶¶ 61–68, and that Verizon acted negligently when it failed to investigate billing disputes filed by FrogNet effectively, id. at ¶¶ 69–76. Lastly, FrogNet has alleged a claim of defamation against Verizon, but it now admits that it has brought this claim beyond the statute of limitations. Opp., at 34. Verizon has moved for summary judgment on all of FrogNet's counterclaims.

## II. Applicable Law

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . should be rendered if the
> pleadings, the discovery and disclosure materials on
> file, and any affidavits show that there is no genuine
> issue as to any material fact and that the movant is
> entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a matter

of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial,

. . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really

have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor

v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)). See also Lansing Dairy, Inc. v. Espy, 39

F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if

there are genuine issues of fact to be tried. Lashlee v. Sumner, 570 F.2d 107, 111 (6th Cir. 1978).

The court's duty is to determine only whether sufficient evidence has been presented to make the

issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of

witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249

(1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that

no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law.

Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003). All the evidence and facts, as well as

inferences to be drawn from the underlying facts, must be considered in the light most favorable to

the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

587–88 (1986); Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001). Additionally, any

"unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of

fact, justify denial of a motion for summary judgment. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157–60 (1970).

"[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson</u>, 477 U.S. at 247–48 (emphasis in original). A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties." <u>Kendall v. Hoover Co.</u>, 751 F.2d 171, 174 (6th Cir. 1984). <u>See also</u> <u>Anderson</u>, 477 U.S. at 248. An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. <u>See also</u> <u>Leary</u>, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. <u>Celotex</u>, 477 U.S. at 322. The nonmoving party must demonstrate that "there is a genuine issue for trial," and "cannot rest on her pleadings." <u>Hall v. Tollett</u>, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. Anderson, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993). The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. Anderson, 477 U.S. at 251–52; Lansing Dairy, Inc., 39 F.3d at 1347.

### III. Analysis

**A. Count One—Breach of Contract**

FrogNet's first claim is that Verizon breached ¶ 5.1.5(B) of the Tariff, which, as mentioned, is incorporated into the agreement. Paragraph 5.1.5(B) provides:

> If, at the annual review, the total quantity of Verizon Infospeed DSL Solutions arrangements that Customer has in-service on the last day of the Contract Year does not meet the minimum arrangement volume applicable to Customer's subscribed Commitment Level, a Shortfall Liability will be assessed. In addition, Customers with Five-Year Commitment Levels B through E with less than the minimum arrangement volumes will be reassigned to a reduced Commitment Level for the next year based on their current arrangement volume (e.g., a Five Year VTDP Customer in Commitment Level C with 40,000 arrangements in-service at the end of year three would be placed in Commitment Level B for year four). As an alternative to reassignment, Customer may stay in its existing Commitment Level for the subsequent year by paying the Alternative Shortfall Liability specified below.

ADSL Tariff, § 5, Part III, ¶ 5.1.5(B). FrogNet claims that Verizon would not allow FrogNet to be either reassigned to a lower level or charged an Alternative Shortfall Liability after it failed to meet its customer commitment level for the first year of the contract. Doc. 17, ¶¶ 44–45. The thrust of FrogNet's claim, however, as argued in the briefs filed by the parties and in the deposition of

FrogNet's CEO, Chip McIntosh, is not a desire to have penalties imposed on FrogNet as a result of its failure to meet its subscribed commitment level under the contract, but a complaint by FrogNet based on Verizon's refusal to allow FrogNet to sign up at Level E. See Opp., at 8–11; McIntosh depo., at 28–31. Verizon has moved for summary judgment on this claim for several reasons, in the course of which it points out that although FrogNet wanted to sign up at Level E, it ultimately chose to sign the agreement at Level B. Its burden in this motion, as mentioned above, is to show that no genuine issue of material fact exists on FrogNet's claim. Leary, 349 F.3d at 897 (6th Cir. 2003).

Verizon argues first that no reasonable jury could find in FrogNet's favor on this claim because FrogNet has not identified any provision of any agreement that was breached by Verizon's refusal to sign the agreement with FrogNet committed at Level E. Motion, at 18–19. FrogNet responds by arguing that FrogNet was "never allowed the opportunity to choose the highest volume commitment (the '5e' level, presumably the level that Verizon Online chose)" and that "nothing in the contract nor the tariff allowed Verizon to choose which volume term commitment FrogNet was allowed to choose." Opp. at 8. Although FrogNet was told that it "[wasn't] big enough," to sign up at Level E, it is FrogNet's contention that "there is no provision in that contract—there's no provision in that tariff that provides for refusal based on size or credit check or location or anything. It was a free-form pick-and-choose program." Opp. at 9 (quoting McIntosh depo. at 31).

The Court agrees with Verizon. FrogNet's assertion that Verizon somehow breached the agreement by refusing to enter into the agreement with FrogNet committed at Level E is wholly without merit. FrogNet has not pointed to any provision of any agreement that could have been breached by this action. Moreover, Verizon was fully entitled to refuse to enter into an agreement containing terms it did not want. Such a right lies at the heart of the freedom of contract. This

argument therefore does not help Count One survive summary judgment because no jury could find there to have been a breach of contract when no provision has been identified as breached.

FrogNet's additional arguments in support of this claim are equally unhelpful. First, FrogNet's statements regarding how much it would have preferred to have entered into a contract with lower pricing and no penalty for failing to meet the customer-commitment requirement, Opp. at 8–9 (quoting McIntosh depo. at 28–31), are irrelevant without an identifiable provision that could have been breached. Second, FrogNet's argument that the agreement is a contract of adhesion, Opp. at 8, is made only in passing, and is followed with no development of the argument or supporting case law. It is, as a result, waived. U.S. v. Elder, 90 F.3d 1110, 1118 (6th Cir. 1996) ("[I]t is a 'settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting U.S. v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). And third, even if this claim were about Verizon's failure to enforce the penalty provisions against FrogNet for its failure to meet Level B's customer-commitment requirement, it would be easily disposed of. FrogNet has not suffered damages as a result of Verizon's failure to penalize it. If anything, it has benefitted. McIntosh even agreed with this proposition in his deposition:

> Q. Was FrogNet happy or unhappy when it learned that it would not be asked to pay shortfall liability?
> A. Both. We were both unhappy and happy. We were happy we would not be knocked on to yet higher pricing with the reassignment. We were happy that no trickery would happen to also tack on a fine. And we were incensed about the fact that we were not permitted to sign onto the 5E contract term in the beginning, given that this happened, because we would have had an extra—even if it is just 750 customers and it was $10 in the pricing, that's $7,500 a month. That would have been huge to us.

McIntosh depo., at 120. As these statements make clear, Count One is really a complaint about Verizon's refusal to contract with FrogNet at Level E.

Summary judgment is therefore appropriate on Count One because no breach has occurred as a result of Verizon's refusal to contract at Level E as a matter of law, which prohibits any reasonable jury from finding in FrogNet's favor on this claim.

**B. Count Two—Breach of Contract**

FrogNet's second claim is that Verizon breached the agreement by informing FrogNet on January 1, 2003 that it would not be allowed to provide DSL services to new customers outside FrogNet's home LATA after May 23, 2003 unless it made certain equipment upgrades to establish a point of presence in those LATAs. FrogNet had provided DSL services to customers in its home LATA, LATA 324, as well as LATAs 325, 326, and 328, throughout the duration of the 2001 contract, and by May 23, 2003, FrogNet had about 600 customers in LATAs 324, 325, 326, and 328. Verizon's prohibitions on new intra-LATA customers amounted to a breach, FrogNet states in its counterclaim, but not of any specific provision of the agreement. Instead, FrogNet points out that neither the agreement nor the ADSL Tariff contain any geographic restrictions on its service area, and FrogNet argues that the breach is of the "obligation of good faith and fair dealing." Doc. 17, ¶ 58.

Verizon moves for summary judgment on several grounds, the first of which is that FrogNet has not identified a specific provision of the agreement or the Tariff that was breached. Motion, at 21. The Court believes there is merit in this argument. FrogNet has not identified any contractual provision that was breached; instead it admits that the contract is silent on the issue of intra-LATA services and seeks to introduce parol evidence to interpret the contract as implicitly permitting new intra-LATA customers. As is explained below, because the agreement contains no ambiguity, parol evidence is inadmissible for the purpose of filling this void. Additionally, FrogNet's second

12

argument—that an agreement not to limit the geographic scope of the DSL services was formed through other documents—is insufficient.

FrogNet argues that although the agreement is silent on the issue of providing intra-LATA service, the intent of the agreement was to allow new intra-LATA DSL customers. To support this, FrogNet seeks to introduce evidence of the parties' performance through the initial duration of the agreement, specifically, the fact that Verizon accepted such customers for the first two years of the agreement and allowed FrogNet to keep these customers when it refused to accept new customers from other LATAs. Opp. at 19. This is not admissible evidence of the intent of the parties. Under Virginia law, which the parties have agreed governs the agreement, Agreement, § 4(H), "[t]he guiding light . . . is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." Quadros & Associates, P.C. v. City of Hampton, 268 Va. 50, 54 (Va. 2004) (quoting Golding v. Floyd, 261 Va. 190, 192 (Va. 2001)). "A contract must be construed as written, and courts are not at liberty to add terms not included by the parties. . . . When contract terms are clear and unambiguous, a court must accord those terms their plain meaning." Id.

Additionally, outside evidence may not be considered in the interpretation of the contract without a finding of ambiguity, especially where an integration clause is present. Spotsylvania County School Bd. v. Seabord Sur. Co., 243 Va. 202, 212 (Va. 1992). Here, the parties have included an integration clause, see Agreement, ¶ 4(L) ("This Agreement constitutes the entire Agreement between the parties concerning the specific subject matter hereof, and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written, between the parties."), and Verizon is correct that there is no ambiguity in the agreement. The practice of

allowing intra-LATA customers previously is therefore not proper evidence of the intent of the parties under the contract.

FrogNet also argues that an agreement to permit intra-LATA service was established after the execution of the agreement. According to FrogNet, it "routinely exchanged emails and entered online orders for DSL services for its extraLATA DSL customers. It is clear that extraLATA DSL was a part of the contractual relationship between Verizon and FrogNet." Opp. at 19–20. What is missing, however, is a description of the substance of any emails that could provide proof of a subsequent agreement to permit new intra-LATA customers in the future, not just for the order or customer at issue in each email. A conclusory allegation, unsupported by facts or evidence, is insufficient to overcome a motion for summary judgment. Fed. R. Civ. P. 56(e) (requiring the nonmoving party to bring forth evidence that demonstrates the existence of a genuine issue of material fact, not just conclusory allegations to that effect). More to the point, however, the mere existence of emails and orders regarding customers in other LATAs does not prove that the parties had an agreement not to prohibit new intra-LATA customers in the future. FrogNet was permitted to keep its existing customers in other LATAs and Verizon only refused to provide services to <u>new</u> customers in these areas if FrogNet refused to make equipment upgrades.

FrogNet has thus failed to meet its burden on summary judgment for this claim. It has not brought forth any evidence that would enable a reasonable jury to find that a provision in the agreement or any subsequent agreement regarding the provision of intra-LATA service was breached.

## C. Count Three—Intentional Interference with Business Relationships

FrogNet's next claim is similar to Count Two. Pointing again to Verizon's refusal to provide

DSL services to new customers in LATAs 325, 326, and 328 unless FrogNet made certain equipment upgrades, FrogNet claims that Verizon intentionally interfered with business relationships it had with customers in those LATAs. Verizon moves for summary judgment on this claim on the following grounds: 1) this claim cannot stand because a breach of contract does not also give rise to a tort claim, 2) FrogNet cannot prove that Verizon interfered with FrogNet's relationship with its customers, and 3) FrogNet cannot identify the customers it alleges were lost as a result of Verizon's interference. For the following reasons, these arguments are insufficient to entitle Verizon to summary judgment. FrogNet has demonstrated that facts do exist in the record on which a reasonable jury could base a finding in its favor on this claim.

Although Virginia law governs the interpretation of the agreement, it does not govern this tort claim. A federal court sitting in diversity applies the choice of law rules of the state in which it sits. Phelps v. McClellan, 30 F.3d 658, 661 (6th Cir. 1994). Ohio's choice of law rules dictate that "the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit." Morgan v. Biro Mfg. Co., Inc., 15 Ohio St. 3d 339, 342 (Ohio 1984).

> To determine the state with the most significant relationship, a court must then proceed to consider the general principles set forth in Section 145. The factors within this section are: (1) the place of the injury; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; (4) the place where the relationship between the parties, if any, is located; and (5) any factors under Section 6 which the court may deem relevant to the litigation. All of these factors are to be evaluated according to their relative importance to the case.

Id. (footnotes omitted). Considering these factors, there is not another jurisdiction that has a more significant relationship to the lawsuit than Ohio. The Verizon plaintiffs are incorporated in Virginia (and perhaps elsewhere, see Compl. at ¶¶ 1–2), but in all other respects, this claim involves Ohio—it is the place of the injury and the conduct that caused the injury, and FrogNet is incorporated in Ohio.

The parties also do not dispute that Ohio law applies to this claim.

In Ohio, to succeed on a claim for tortious interference with a business relationship, one must show: (1) a business relationship; (2) the tortfeasor's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." <u>Chandler & Assoc., Inc. v. America's Healthcare Alliance, Inc.</u>, 125 Ohio App. 3d 572, 583 (Ohio Ct. App. 1997); <u>see also</u> <u>Geo-Pro Serv., Inc. v. Solar</u>, 145 Ohio App. 3d 514, 525 (Ohio Ct. App. 2001).

Verizon's first argument is that FrogNet's allegations on this claim amount to nothing more that the same breach of contract claim in Count Two that this Court has already rejected. Thus, it states, there can be no tort claim for intentional interference with business relationships when the relationship between the parties is contractual; a contract claim is FrogNet's only remedy. Motion at 24. Verizon is correct that it is not a tort to breach a contract, but a tort action may still lie, despite the existence of a contract between two parties, if a party has breached a duty that existed separate and apart from all contractual duties. <u>Textron Financial Corp. v. Nationwide Mutual Insurance Co.</u>, 115 Ohio App. 3d 137, 151 (Ohio Ct. App. 1996) (citations omitted) ("A tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed."). Of relevance here, "[t]he law recognizes a duty to abstain from the wrong of intentional harm to others." <u>Haller v. Borror Corp.</u>, 50 Ohio St. 3d 10, 16 (Ohio 1990). And tortious interference with business relationships is an intentional tort. <u>Id.</u> Thus, the existence of the contract between Verizon and FrogNet does not automatically ban this claim.

Verizon's second argument for summary judgment on this claim is that FrogNet cannot prove that Verizon intentionally interfered with its business relationships with its DSL customers. As the nonmovant on the elements of this claim at trial, Verizon is permitted to rely on "the failure of the nonmoving party to produce 'more than a mere scintilla of evidence' which would create a genuine dispute for the jury." Leary, 349 F.3d at 897 (quoting Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir.2001)). In doing so, it need only "state that there is an absence of facts or evidence to support [FrogNet's] claims." Jefferson v. Chattanooga Pub. Co., 375 F.3d 461, 463 (6th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Elkins v. Richardson-Merrell, Inc., 8 F.3d 1068, 1071 (6th Cir.1993)).

Here, Verizon admits that FrogNet can prove the first two elements of the test for tortious interference: 1) a business relationship, and 2) Verizon's knowledge thereof. Verizon then looks to the third element, an intentional interference causing a breach or termination of the relationship. Verizon claims that "there is no allegation or even any suggestion—in the Counterclaim or anywhere in the 492 pages of deposition transcript—that [Verizon] caused the extra-LATA customers, of their own volition, to stop doing business with FrogNet." Motion at 26. This is sufficient to meet its burden. As a result, FrogNet "must—by affidavits or as otherwise provided in [Rule 56]—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e).

Looking at the totality of the record in the light most favorable to FrogNet, there is sufficient evidence to show that material facts exist on which a reasonable jury could find that Verizon intentionally interfered with FrogNet's business relationships with its customers. Indeed, the existence of evidence of an intentional interference appears to be quite clear: it is undisputed that Verizon disconnected service for FrogNet's DSL customers. McIntosh depo., at 83. It is also

undisputed that Verizon's prohibition on new intra-LATA customers made it impossible for those customers outside of FrogNet's home LATA to reconnect with FrogNet. Id. at 74, 79–80, 83. This evidence is sufficient to permit a reasonable jury to find that Verizon interfered with FrogNet's business relationships.

Beyond this direct evidence, there is a great deal of circumstantial evidence surrounding the series of events that led to the disconnection of FrogNet's DSL lines.[1] This evidence comes largely from the deposition testimony of FrogNet's CEO, Chip McIntosh, and it tends to suggest that Verizon may have been attempting to keep FrogNet from growing while another Verizon entity—Verizon Online—was about to begin providing DSL service in Ohio. McIntosh depo., at 136–38. Verizon Online had been working to obtain approval to provide DSL services in Ohio since June of 2000, and it was expecting to be allowed to begin providing DSL service at the conclusion of a 36 month period in June of 2003. Id. With this fact in mind, this circumstantial evidence may lead reasonable jurors to question Verizon's motives as it decided to disconnect FrogNet's DSL service in May of 2003.

---

[1]

Verizon argues that circumstantial evidence is impermissible as evidence of interference; only direct evidence will suffice. Motion, at 23–24 (citing Busch v. Premier Integrated Medical Assoc., 2003-Ohio-4709, ¶¶ 52–56 (Ohio Ct. App. 2003)). This is incorrect. In Busch, the court merely held that the circumstantial evidence that the non-movant brought forth in that case did not, in its view, give rise to an inference that the movant had interfered with a business relationship. 2003-Ohio-4709, at ¶¶ 56–57. It did not hold that circumstantial evidence is always insufficient. Thus, insofar as FrogNet's evidence is circumstantial, it is not impermissible to draw reasonable inferences from that evidence of Verizon's interference. Additionally, Verizon's argument that Engineering Excellence, Inc. v. Meola supports this same proposition is also unpersuasive. Motion, at 24 (citing 2002-Ohio-5412, ¶ 28 (Ohio Ct. App. 2002)). The Court in Meola rejected an attempt to use circumstantial evidence to establish that the act of interference had occurred when there was already direct evidence to the contrary in the record. 2002-Ohio-5412, at ¶¶ 27–29. Here, Verizon is relying on the failure of FrogNet to produce evidence of interference, not on direct evidence of its own. Additionally, there is already direct evidence of interference—the act of disconnecting FrogNet's DSL customers' service and prohibiting some customers from reconnecting.

As an initial matter, the prohibition on new intra-LATA service was communicated to FrogNet in late 2002, but "[i]t was unclear whether it was a matter of Verizon policy internal or something else. It was never spelled out for [FrogNet] by Verizon." Id. at 73–74. Although Verizon at one point claimed that it was required by federal law, as mentioned above, it has never pointed to that law. Furthermore, Verizon's offer to continue to allow new intra-LATA customers if FrogNet set up a Point-of-Presence in those LATAs required FrogNet to purchase and rent costly materials from Verizon. Id. at 170–74.

With respect to FrogNet's decision to migrate its customers back to the retail model, McIntosh states that FrogNet started discussing this with Verizon in January of 2003 because of the continuing troubles with billing and Verizon's reversal of its policy on FrogNet personnel joining in on customer support phone calls. Id. at 59. In these discussions, FrogNet sought a smooth migration for its customers—one that did not require FrogNet's customers to disconnect at all. At first, FrogNet spoke with a Verizon representative with whom it had worked in the past on customer migrations, some of which were for individual customers and others of which were for mass migrations of customers like the present one. Id. at 59–60. "It had typically been a transparent process," McIntosh states, "It was simply a billing change. There was no need for loss of service or downtime on their part." Id. at 60. After looking into the possibility of a smooth mass migration this time around, the Verizon representative and one of its billing supervisors confirmed that such a migration was possible:

> [They] both confirmed that, yes, it was entirely doable, it was actually a very simple process. They sent us a blank spreadsheet, and they said the migration would be transparent to the customer. The only thing that would change is that starting the next month the customer would receive a bill for the Verizon DSL phone line portion on their Verizon bill. So we would return back to the original DSL model. . . . Additionally, we would be able to support those customers by way of having them

on the phone with us and Verizon.

Id. at 60–61. It also appears, however, that FrogNet was warned that migrating customers outside of FrogNet's home LATA "probably wouldn't work" because of the prohibition on new intra-LATA customers. Id. at 76–77. Nonetheless, FrogNet claims that the crux of Verizon's interference came a few months later when "all the wholesale customers were disconnected for a week because Verizon stopped wholesale to retail migration." McIntosh depo., at 79.

FrogNet eventually got word that Verizon's General Counsel had been the one to "put a stop on" the migration because of the substantial billing disputes still pending. Id. at 80–81. The disputes were quite substantial by that point, and FrogNet claims that it had made arrangements to pay the undisputed portions of its unpaid bills, but that its ability to complete those arrangements was dependent upon its ability to move its customers from the wholesale model to the retail model. Id. at 81–82. This effort to move customers to the retail model was complicated, however, when the General Counsel presented FrogNet with an ultimatum. The only way he would allow FrogNet to avoid disconnections and enjoy a seamless migration of FrogNet's customers to the retail model was if FrogNet would do one of two things: 1) pay all undisputed amounts directly to Verizon and place all disputed amounts in escrow, plus pay the termination fee to end the Agreement and all Shortfall Liability owed for failing to meet its customer commitment requirements, or 2) in the words of McIntosh, "he said we could give all our customers to another wholesale ISP and exit the DSL business altogether." McIntosh depo., at 81–83, see also id. at 213–14. According to McIntosh, FrogNet "could accept neither option and [thus] had [its] lines disconnected. All other customers lost service, all of [its] wholesale customers lost service, and many of the LATA 324 customers reconnected with [FrogNet], but it took a week." Id. at 83.

This circumstantial evidence may lead reasonable jurors to believe that Verizon interfered with FrogNet's business relationships with its customers in its attempt to provide Verizon Online with an available customer base as it entered the market in June of 2003. It bears emphasizing at this point, however, that the direct evidence mentioned above—Verizon's disconnection of FrogNet's DSL service and its refusal to allow new intra-LATA customers—is alone enough to permit FrogNet to meet its burden on summary judgment. A reasonable juror could find based on this direct evidence that Verizon interfered with FrogNet's business relationships with its customers.

Verizon also points to the fourth element, damages, and argues that FrogNet cannot identify any of the 180 customers that were lost. Motion, at 23. It does not, however, challenge the existence of damages. Yet the existence of damages, along with evidence showing the amount of damages "to a fair degree of probability," is all that is necessary. Collins v. Mullinax East, Inc., 153 Ohio App. 3d 534, ¶ 21 (Ohio Ct. App. 2003) ("[W]here the existence of damage is established, the evidence need only tend to show the basis for that computation of damages to a fair degree of probability. Only reasonable certainty as to the amount of damages is required, which is that degree of certainty of which the nature of the case admits.") (internal citations omitted). Considering the totality of the record, the Court believes that there is sufficient evidence in the record to permit a reasonable jury to find that FrogNet has suffered damages as a result of Verizon's alleged tortious interference. McIntosh has stated that FrogNet lost approximately 180 customers as a result of Verizon's May, 2003 disconnection of its customers' service. McIntosh depo., at 79–80, 160–62, 166-67, 276–77. And he has pointed to methods through which their identities may be identified. Id. at 276–77 ("I can get how many customers we lost at that point . . . I can get that to a T with this [spreadsheet]. I can get that down to the customer, if I had an hour with the spreadsheet."); see also id. at 160–62.

For the purposes of summary judgment, this is sufficient evidence to show both the existence of damages and, with a reasonable degree of certainty given "the nature of the case," the amount of damages.

Given that there is evidence that would permit a reasonable jury to find that the first four elements of the test for tortious interference are met, summary judgment on FrogNet's claim for tortious interference is inappropriate.[2]

---

[2] Verizon makes two additional arguments that deserve mention. First, it argues that it was entitled to disconnect FrogNet's service because of § 2.2.2 of the ADSL Tariff, which permits Verizon to terminate services due to nonpayment by FrogNet. It is not clear from the record, however, exactly what portions of the bills have or have not been paid; indeed, this dispute is the focal point of Verizon's claims against FrogNet. Moreover, insofar as some portion of the bills are undisputed and unpaid, the parties have neither identified those portions to the Court nor submitted evidence of their substance. See, e.g., McIntosh depo., at 215–18. Summary judgment on this basis is therefore inappropriate due to these "unexplained gaps" in the record. See Adickes, 398 U.S. at 157–60.

Verizon's other argument is that there are two limitation-of-liability clauses in the agreement that bar the claim. Motion, at 14–18. The first bars recovery for "incidental, indirect, special or consequential damages." Agreement, ¶ 3. Verizon argues, in passing, that the damages sought here—lost profits from the lost customers—are consequential damages, citing Nat'l Mulch & Seed, Inc. v. Rexius Forest By-Products, Inc. for the broad proposition that "lost profits are consequential damages." Motion, at 14 (citing Rexius, Not Reported in F.Supp. 2d, 2007 WL 894833 (S.D. Ohio 2007)). Rexius, however, does not state that all lost profits fall into the category of consequential damages. Nor is its analysis applicable here; the lost profits involved in that case stemmed from the breach of a contract for the sale of goods, not from an intentional tort. And contrary to Verizon's assertion, the Court merely noted that "[a] buyer's consequential damages frequently include profits lost as a result of the seller's breach." 2007 WL 894833, *28. Its categorization of the lost profits in that case was thus done in the context of a contract for the sale of goods; profits were lost by the recipient of allegedly defective goods. Id. at *2, *27–*29. The loss of customers alleged here by FrogNet, however, is the direct result of Verizon's allegedly tortious interference with FrogNet's relationship with those customers, not a consequential one. Application of ¶ 3 to bar this claim is therefore precluded.

The second provision, contained in the ADSL Tariff that is incorporated into the agreement, limits liability to only that which "aris[es] solely and directly from mistakes, omissions, interruptions, delays, errors, or defects in transmission occurring in the course of furnishing service that are not caused in whole or in part by acts or omissions of any other person." ADSL Tariff, § 2.3.1. It does not preclude liability on this tortious interference claim, however, because the liability asserted is within the purview of that allowed by § 2.3.1 This is a claim for Verizon's

**D. Count Four—Negligence**

FrogNet's next claim is for negligence. FrogNet alleges that during the 2001 agreement Verizon had an online system in which FrogNet could file billing disputes and that, although FrogNet filed numerous disputes through the spring of 2003, Verizon "failed to effectively investigate the Defendants' billing disputes." Counterclaim, doc. 17, at ¶ 75. Verizon, in turn, argues, among other things, that this claim cannot stand because Verizon's duty to bill FrogNet was only assumed pursuant to the terms of the agreement. Thus, only a contract claim may lie because it is not a tort to breach a contract and FrogNet has not pointed to any other duty on which a tort claim may be based. The Court agrees with Verizon.

It is well-settled that where a contract exists between two parties, a breach of that contract does not create a tort claim. "A tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed." <u>Textron Financial Corp. v. Nationwide Mutual Insurance Co.</u>, 115 Ohio App. 3d 137, 151 (Ohio Ct. App. 1996). Thus, "the existence of a contract action generally excludes the opportunity to present the same case as a tort claim." <u>Id.</u> at 151 (quoting <u>Wolfe v. Continental Cas. Co.</u>, 647 F.2d 705, 710 (6th Cir. 1981). <u>See also</u> <u>Allied Erecting and Dismantling Co., Inc. v. Uneco Realty Co.</u>, 116 Ohio App. 3d 410, 417 (Ohio Ct. App. 1996) ("A tort claim may not arise where the duty to fulfill the terms of the bargain arises only from the contract."). The reasoning behind this is that "[t]ort law is not designed . . . to compensate parties for losses suffered as a result of a breach

---

disconnection and prohibition on reconnection of many of FrogNet's customers—i.e., ". . . omissions [or] interruptions . . . in transmission."

of duties assumed only by agreement." <u>Floor Craft Floor Covering, Inc. v. Parma Community General Hospital Ass'n</u>, 54 Ohio St. 3d 1, 7 (1990).

In the agreement, Verizon was obligated to bill FrogNet for services it rendered. It has done so, although many disputes have arisen out of those billings. Indeed, the disputes have been so great that they have caused Verizon to bring this suit. Nonetheless, the propriety of the parties' actions—i.e., whether either has breached the billing and payment requirements of the agreement—may only be determined through a contract action because Verizon did not have any legal duties in this regard separate and apart from those it assumed in the agreement. Without "a duty owed separately from that created by the contract," <u>Textron</u>, 115 Ohio App. 3d at 151, FrogNet's claim for negligence cannot stand.

In response, FrogNet points to <u>Battista v. Lebanon Trotting Ass'n</u>, 538 F.2d 111 (6th Cir. 1976), and argues that Verizon did have a duty separate and apart from those laid out in the agreement. <u>Battista</u> is said to support the notion that "the tort liability of parties to a contract . . . arises from the breach of some positive legal duty of good faith imposed by law because of the relationship of the parties, rather than from a mere omission to perform a contractual obligation." Opp., at 32. The duty FrogNet claims was breached by Verizon is then stated as "an implied duty to issue accurate bills and/or fix any errors to those bills," which, FrogNet argues, has arisen from the "nature of the relationship between" FrogNet and Verizon. Opp., at 32. No further elaboration of the nature of the relationship is given.

FrogNet's argument is unpersuasive. <u>Battista</u> does, indeed, stand for the proposition that a tort claim between parties to a contract must be based on some duty separate and apart from the duties imposed by the contract, which can arise from the special nature of the relationship between

the parties. 538 F.2d, at 117. This rule, however, has generally only been applied to the context of the relationship between an insurance company and its insured. In <u>Battista</u>, for example, the court noted the existence of a duty based on the special relationship between an insurance company and its insured and described the duty as follows:

> An insurer owes to its insured an implied-in-law duty of good faith and fair dealing that it will do nothing to deprive the insured of the benefits of the policy. This special duty, enforced through tort liability, is necessary because of the relationship between the parties and the fact that in the insurance field the insured usually has no voice in the preparation of the insurance policy and because of the great disparity between the economic positions of the parties to a contract of insurance; and furthermore, at the time an insured party makes a claim he may be in dire financial straits and therefore may be especially vulnerable to oppressive tactics by an insurer seeking a settlement or a release.

<u>Id.</u> at 117–18 (internal citations omitted). Ultimately, however, the court found that the special considerations that exist in the context of an insurance contract which warranted the special duty were not present between the parties in that case. "The special considerations existent in a consumer-held insurance contract do not apply to an ordinary contract between businessmen." <u>Id.</u> at 118.

None of the special considerations mentioned by the court relating to an insurance contract are present in this case. The parties are both providers of high-speed internet service and there is no indication that their relative bargaining positions were so unequal that FrogNet had virtually "no voice" in the preparation of the contract, nor was it especially vulnerable. For the purposes of this claim, the agreement is simply "an ordinary contract between businessmen." As a result, <u>Battista</u> does not provide support for this claim. Instead, Verizon's billing obligations were only assumed pursuant to the contract, making a contract action the proper remedy for an alleged breach of these contract duties. Lacking any duty apart from those Verizon undertook in the agreement, no reasonable juror could find that Verizon has acted negligently and "failed to effectively investigate

the Defendants' billing disputes." Counterclaim, at 8. Therefore, summary judgment on this claim is appropriate.

**E. Count Five—Defamation**

Lastly, FrogNet has brought a claim for defamation against Verizon. FrogNet has admitted that this claim is time-barred. Opp., at 34. Summary judgment is therefore proper on this claim as a matter of law.

**IV. Conclusion**

For the reasons stated above, Verizon's Motion for Summary Judgment is **GRANTED** as to FrogNet's two claims for breach of contract, its claim for negligence, and its claim for defamation, and **DENIED** as to FrogNet's claim**s** for tortious interference with a business relationship.


**IT IS SO ORDERED.**


Date:  April 2, 2010                              **/s/ John D. Holschuh**
                                                  John D. Holschuh, Judge
                                                  United States District Court