**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **VERIZON ADVANCED DATA, INC.,** *et al.*, | : | |
| | : | **Case No. 2:05-cv-955** |
| **Plaintiffs,** | : | **Judge Frost** |
| **v.** | : | **Magistrate Judge Deavers** |
| **FROGNET, INC.,** *et al.*, | : | |
| **Defendants.** | : | |
| | : | |

**OPINION AND ORDER**

Plaintiffs Verizon Advanced Data, Inc.; Verizon Advanced Data-Virginia, Inc.; and

Verizon Select Services (collectively, "Verizon") have moved in limine to exclude 34 trial

exhibits identified by Defendants FrogNet, Inc., and FrogNet DSL, Inc., (together, "FrogNet").

(Doc. # 88). For the reasons that follow, the Court **GRANTS** the motion.

**I. Background**

On October 19, 2005, Plaintiffs filed suit against Defendants seeking allegedly unpaid

invoices on four DSL accounts numbered 0003609843833, 0003600029546, 0003609840194,

and 0003609843282 (the "Claim"). Under their wholesale DSL agreement, the amount charged

by Plaintiffs was dependent on the number of active end users of Defendants' internet service

and each end user's chosen speed of internet service. End users received one bill from

Defendants as opposed to a retail model under which end users must pay separately for internet

service from an internet service provider ("ISP") and for the use of DSL phone lines from

another company.

Meanwhile, Defendants accuse Plaintiffs of intentionally interfering with their business

relationships with Defendants' end-user customers located in Local Access and Transport Area (LATA) 325, 326, and 328 by cutting off their DSL services on May 23, 2003 (the "Counterclaim"). Defendants allege that Plaintiffs then sold DSL services to those very customers through a subsidiary after refusing to allow Defendants to offer internet service outside LATA 324.

## II.  Standard of Review

Although neither the Federal Rules of Evidence nor the Federal Rules of Civil Procedure explicitly authorize the Court to rule on an evidentiary motion in limine, the Supreme Court has noted that the practice of ruling on such motions "has developed pursuant to the district court's inherent authority to manage the course of trials."  Luce v. United States, 469 U.S. 38, 41 n.4 (1984).  The purpose of a motion in limine is to allow the Court to rule on issues pertaining to evidence in advance of trial in order to both avoid delay and ensure an evenhanded and expeditious trial.  See Indiana Ins. Co. v. Gen. Elec. Co., 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004) (citing Jonasson v. Lutheran Child & Family Servs., 115 F.3d 436, 440 (7th Cir. 1997)). Pretrial orders also often save the parties time and cost in preparing for trial and presenting their cases.

Courts are generally reluctant to grant broad exclusions of evidence in limine, however, because "a court is almost always better situated during the actual trial to assess the value and utility of evidence."  Koch v. Koch Indus., Inc., 2 F. Supp. 2d 1385, 1388 (D. Kan. 1998); accord Sperberg v. Goodyear Tire & Rubber Co., 519 F.2d 708, 712 (6th Cir. 1975).  A court should not make a ruling in limine unless the moving party meets its burden of showing that the evidence in question is clearly inadmissible.  Indiana Ins. Co., 326 F. Supp. 2d at 846; Koch, 2 F. Supp. 2d at

1388. If this high standard is not met, evidentiary rulings should be deferred so that the issues may be resolved in the context of the trial. Indiana Ins. Co., 326 F. Supp. 2d at 846. Ultimately, whether a motion in limine is granted or denied is a matter left to the sound discretion of the Court. See Hesling v. CSX Tranp., Inc., 396 F.3d 632, 643-44 (5th Cir. 2005) (citing United States v. Sharpe, 193 F.3d 852, 867 (5th Cir. 1999); Buford v. Howe, 10 F.3d 1184, 1188 (5th Cir. 1994)).

### III. The Exhibits

Plaintiffs seek to exclude 34 documents identified by Defendants in their Exhibit List for Trial. Plaintiffs have divided these documents into five groups containing the following exhibits:

- Section A:   Exhibits D1, E1, I1, J1, K1, L1, M1, N1, O1, P1

- Section B:   Exhibits R1, S1, J2, K2

- Section C:   Exhibits T1, U1, V1, I2

- Section D:   Exhibits F1, A2, B2, C2, E2, F2, G2, R2, S2, W2

- Section E:   Exhibits W, M2, N2, O2, P2, Q2

Each are discussed, in turn, below.

*1) Section A*

First, Plaintiffs argue that the Section A exhibits should be excluded under Federal Rule of Evidence 402 because they are not relevant to the Claim or Counterclaim. The exhibits in Section A are the following:

- Exhibit D1:   Email from Susan Birdwell of FrogNet to Barbara Porter, a billings claim representative with Verizon dated December 6, 2001;

- Exhibit E1:   Email from Barbara Porter to Clay Fouts of FrogNet dated

December 5, 2001;

- Exhibit I1:     FrogNet Trouble Ticket #141309 commencing April 27, 2005;

- Exhibit J1:     FrogNet Trouble Ticket #136551 commencing March 2, 2005;

- Exhibit K1:     FrogNet Trouble Ticket #128953 commencing December 15, 2004;

- Exhibit L1:     FrogNet Trouble Ticket #128306 commencing December 9, 2004;

- Exhibit M1:     FrogNet Trouble Ticket #128077 commencing December 7, 2004;

- Exhibit N1:     FrogNet Trouble Ticket #123107 commencing October 4, 2004;

- Exhibit O1:     FrogNet Trouble Ticket #112989 commencing July 12, 2004; and

- Exhibit P1:     FrogNet Trouble Ticket #154588 commencing August 18, 2005.

"Evidence which is not relevant is not admissible." Fed. R. Evid. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. The Sixth Circuit has recognized that "[t]he standard for relevancy is 'extremely liberal.'" United States v. Whittington, 455 F.3d 736, 738 (6th Cir. 2006) (quoting Douglass v. Eaton Corp., 956 F.2d 1339, 1344 (6th Cir. 1992)). A district court may not "consider the weight or sufficiency of the evidence in determining relevancy." Robinson v. Runyon, 149 F.3d 507, 512 (6th Cir. 1998). In addition, "even if a district court believes the evidence is insufficient to prove the ultimate point for which it is offered, it may not exclude the evidence if it has even the slightest probative worth." Douglass, 956 F.2d at 1344.

In their motion in limine, Plaintiffs argue that the Section A exhibits concern only "Fast Packet" accounts which are billed independently of the four wholesale DSL accounts which Defendants allegedly have not paid. For support, Plaintiffs offer the affidavit of John Sutton, a

Verizon employee who worked as an access order representative for DSL wholesale ISPs from 2001 to 2006. (Sutton Aff. ¶ 2). Sutton asserts that "[a]ny alleged billing concerns or disconnect orders to the Fast Packet circuits . . . would not impact, in any manner, the amounts billed monthly to FroGnet for its active DSL wholesale customers." (Id. at ¶¶ 10–19). Meanwhile, Plaintiffs contend that the amounts billed to Defendants was dependant on the number of active end users of Defendants' internet service and each end user's chosen speed of internet service.

Defendants do not dispute that these exhibits concern accounts billed independently of the accounts at issue in this action. Instead, Defendants maintain that they show "Verizon was billing FrogNet for a circuit that Verizon was not even geographically capable of provisioning." (Defs.' Mem. in Opp'n at 4). Defendants argue that the exhibits are relevant as "as an example of Verizon's inability to properly bill thus calling into question the accuracy of the billings allegedly owed by FrogNet." (Id.). In addition, Defendants contend that "this large billing error raises the issue of whether Verizon intentionally interfered with FrogNet's business by seeking collections on bogus charges." (Id.). Alternatively, Defendants claim that the exhibits are "background evidence" which serve as an "aid to understanding" as envisioned by the Advisory Committee. See Fed. R. Evid. 401 advisory committee notes ("Evidence which is essentially background in nature can scarcely be said to involve a disputed matter, yet it is universally offered and admitted as an aid to understanding. Charts, photographs, views of real estate, murder weapons, and many other items of evidence fall into this category.").

Despite the substantial leeway of Rules 401 and 403, the Section A exhibits are so tenuous as to the Claim and Counterclaim that they have no "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less

5

probable." Although the exhibits highlight billing disputes between the parties, Defendants admit that these disputes have no bearing on whether they owe Plaintiffs $180,564.06 on the wholesale DSL accounts listed in the Complaint. Furthermore, Defendants curiously point to nothing beyond the size of these disputes to show that Plaintiffs disconnected DSL services to Defendants' customers and subsequently sold DSL services to those customers through an affiliate. See Answer ¶¶ 61–68; Defs.' Mem. in Opp'n to Summ. J.).

"Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case." Fed. R. Evid. 401 advisory committee notes. "Whether the relationship exists depends upon principles evolved by experience or science, applied logically to the situation at hand." Id. Here, there is no logical relationship between the Section A exhibits and either the Claim or Counterclaim. Therefore, the exhibits are clearly inadmissible as irrelevant.

*2) Section B*

Next, Plaintiffs allege that the Section B exhibits are irrelevant to the Claim and Counterclaim because they relate only to a change in Verizon's billing procedures applicable to all ISPs. Plaintiffs contend that these exhibits are relevant only to Defendants' original counterclaim for negligent billing practices which did not survive summary judgment. The exhibits in Section B are:

- Exhibit R1:    An agenda for a February 26, 2003, conference call with all ISPs concerning new billing procedures known as "iBill";

- Exhibit S1:    An iBill User's Guide Supplement;

- Exhibit K2:    A copy of Exhibits R1 and S1 with an email cover correspondence; and

6

- Exhibit J2:    A communication to all ISPs attaching a document entitled "An Introduction to Phase I of VzzBB West iBill."

Defendants seek to use these exhibits while cross-examining Verizon witnesses to ask "why the change was made [in the billing procedures] and what system problems may have made the change necessary." (Defs. Mem. in Opp'n at 4). They further argue that this inquiry goes to the heart of their defense that "Verizon's billing procedures as a whole were flawed and that any summary of alleged amounts due are not verifiable." (Id. at 4–5). Plaintiffs counter, arguing that "Verizon will establish the amounts due under the DSL contract based upon FrogNet's own admissions as to the number of end users which it had during the time period of January to May 2003." Defendants finally contend that "a reasonable fact-finder could decide that the billing changes had an impact on interfering with all ISP's businesses, including FrogNet's" and that the exhibits are also relevant "as an aid to understanding." (Id. at 5).

Defendants may want to use these exhibits as a launching point from which to attack any "summary of alleged amounts due." However, when given the opportunity, they have not offered any logical relationship between the change in Verizon's billing procedures and any assertion that they do not owe the amount claimed by Plaintiffs. Nor have Defendants demonstrated in any way how these exhibits tend to prove that Plaintiffs disconnected the internet to Defendants' customers and prevented those customers from re-subscribing with Defendants.

*3) Section C*

Plaintiffs also argue that the Section C exhibits are relevant only to an internal process by Verizon to identify any DSL telephone lines that were not being billed by ISPs, including FrogNet, not the Claim or Counterclaim. The exhibits in Section C are:

- Exhibit U1:    Verizon communication to all ISPs concerning billing inventory of

                DSL lines;

- Exhibit I2:    A copy of Exhibit U1 with an email cover sheet to FrogNet;

- Exhibit T1:    Verizon communication to all ISPs concerning Phase 2 of a billing inventory of DSL lines; and

- Exhibit V1:    FrogNet's resposne to Verizon's billing inventory of DSL lines.

Meanwhile, Defendants seek to show that this review showed that Verizon was billing them "for circuits that were or should not have been disconnected." (Id.). Defendants argue that these exhibits tend to show that "Verizon was not certain of the accuracy of its records listing the circuits currently in service for ISPs, including FrogNet." (Id.). Defendants want to "Use this evidence in its cross-examination of Verizon's witnesses seeking to determine how widespread and systemic this issue was during the applicable period." (Id.).

Again, Defendants make no attempt to link the information in these exhibits to the accounts at issue to the Claim or the behavior alleged in the Counterclaim. Instead, they argue merely that billing errors had been made in the past on different accounts and therefore, the Court cannot trust Verizon's bills now. This is an irrelevant argument, particularly because Plaintiff does not even seek to use its own billing records to prove the amounts owed by Defendants.

*4) Section D*

The exhibits in Section D predate the June 2001 Infospeed DSL Solutions Term and Volume Discount Program Purchase Agreement between the parties. This section is divided into two subsets. The exhibits in the first subset relate only to GTE's ADSL product[1] offered to ISPs,

---

[1] GTE's assets were purchased by Verizon in 2000. (Defs.' Mem. in Opp'n to Summ. J. at 2).

and the exhibits in the second subset concern the establishing of the Verizon DSL product and

early communications regarding that product. The exhibits in the first subset are:

- Exhibit F1: January 2000 email correspondence from GTE to FrogNet forwarding several communications to all ISPs concerning various methods and procedures relating to the GTE ADSL product;

- Exhibit A2: Email from Matthew Mitchem to Chip McIntosh forwarding a PowerPoint presentation on GTE's ADSL product dated June 3, 1998;

- Exhibit B2: Email from Susan Birdwell to Chip McIntosh concerning the ADSL pricing for the GTE product in March 2000 dated March 3, 2000;

- Exhibit C2: Email from Susan Birdwell to Chip McIntosh concerning FrogNet's progress with GTE's ADSL product and its co-marketing report regarding the same dated October 31, 2000;

- Exhibit R2: GTE Wholesale ADSL communication to all ISPs regarding pricing of the GTE product; and

- Exhibit G2: GTE Wholesale ADSL communication to all ISPs regarding procedures and processes fro the GTE product.

The exhibits in the second subset are:

- Exhibit E2: Email from Verizon to DSL Wholesalers relating to delay in some areas due to demand exceeding supply dated February 9, 2001;

- Exhibit W2: Verizon Wholesale Bulletin SA94-DSL Deployment spreadsheet, apparently listing areas and updated deployment dates for Verizon DSL;

- Exhibit F2: Email from Susan Birdwell to Clay Fouts concerning the current deployment schedule for Verizon DSL dated February 28, 2001; and

- Exhibit G2: Email from Susan Birdwell to Chip McIntosh inquiring about a co-marketing agreement dated April 24, 2001.

Plaintiffs argue that the exhibits in the exhibits in each subset are irrelevant as to the

Claim and Counterclaim. Defendants maintain that these exhibits provide "helpful background for the Court to compare and contrast the business practices of GTE versus those of Verizon after the merger [resulting in Verizon] was completed." (Id. at 6). Defendants seek to use this evidence because "[i]n order for FrogNet to argue that Verizon's treatment of FrogNet was far worse than that of GTE, FrogNet must first lay the foundation as to the business practices of GTE in the DSL market." (Id.). In addition, Defendants contend that these documents go "to FrogNet's claim that Verizon targeted ISPs like FrogNet for elimination from the DSL market." (Id.).

       Whether Defendants preferred to do business is wholly irrelevant as to whether FrogNet owes any amount on the accounts listed in Plaintiffs' Complaint and as to whether Plaintiffs terminated DSL service to Defendants' customers in 2003 and prevented them from re-subscribing with Defendants. Simply put, the Court sees no logical relationship. Furthermore, that GTE did not tortiously interfere with Defendants' business relationships in no way tends to prove that Plaintiffs did. Finally, there is nothing in these exhibits which remotely indicates that Verizon targeted ISPs like Defendants for elimination.

*5) Section E*

       Finally, Plaintiffs seek to exclude the five exhibits in Section E. These exhibits relate to the tariffed rates of Verizon's DSL wholesale product effective as of April 2003. They are:

- Exhibit W:     Email from Kenneth Donchatz to Chip McIntosh dated April 25, 2006, containing a complaint from FrogNet subscriber Joe Wolfe to Mr. McIntosh dated April 21, 2006.

- Exhibit M2:    Email from Verizon Advanced Data, Inc., to DSL Wholesalers detailing new tariffed rates dated May 2, 2003;

- Exhibit N2:    Email from Verizon Advanced Data, Inc., to DSL Wholesalers

updating a list of central offices scheduled for 2003 deployment dated May 29, 2003;

- Exhibit O2:    Email from Verizon Advanced Data, Inc., to DSL Wholesalers detailing billing procedures for new Five-Year Infospeed DSL contracts dated June 27, 2003;

- Exhibit P2:    Email from Verizon to DSL Wholesalers updated new tariffed rates and including a copy of the new tariff dated May 4, 2004; and

- Exhibit Q2:    Email from Verizon to DSL Wholesalers regarding changes to the billing procedures for all wholesale DSL accounts dated September 23, 2004.

Defendants maintain that these documents "are probative of the issue as to whether Verizon offered favorable service options to its affiliated ISP Verizon Online *after* Verizon refused to allow FrogNet to continue selling DSL outside of its home LATA," and are thus relevant to the Counterclaim (Id.). Plaintiffs counter by arguing that these new, more favorable rates, were applicable to all ISPs, and that FrogNet merely was no longer interested in the product.

Again, Defendants fail to articulate a link between the lower price Plaintiffs offered to all ISPs after the relevant time period to the Claim and Counterclaim. That Plaintiffs offered all ISPs a lower price does not tend to make more probable the allegation that Plaintiffs effectively stole Defendants' customers for an affiliate. There is simply no logical relationship.

11

## IV.  Conclusion

Based on the foregoing, the Court **GRANTS** Plaintiffs' motion in limine.  (Doc. # 88.)
As with all in limine decisions, these rulings are subject to modification should the facts or
circumstances at trial differ from that which has been presented in the pre-trial motion and
memoranda.

**IT IS SO ORDERED.**

<u>**/s/ Gregory L. Frost**</u>
**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**