# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**VERIZON ADVANCED DATA INC., et al.,**

        **Plaintiffs,**

                                **Case No. 05-cv-955**
    **v.**                                **JUDGE GREGORY L. FROST**
                                   **Magistrate Judge E.A. Preston Deavers**

**FROGNET, INC., et al.,**

        **Defendants.**

## OPINION AND ORDER

This matter came on for a trial to the Court on October 11, 2011, which continued through October 12, 2011. During that trial, the Court granted Defendants FrogNet, Inc. and FrogNet DSL, LLC's (together "FrogNet") motion for judgment as a matter of law on the breach of contract, unjust enrichment, and accounting claims of Plaintiffs Verizon Advanced Data Inc. ("VADI"), Verizon Advanced Data-Virginia Inc., and Verizon Select Services Inc. (together "Verizon") and took under advisement FrogNet's intentional interference with business relationship counterclaim. Verizon moved for reconsideration of the Court's decision to grant FrogNet's motion for judgment as a matter of law (ECF No. 117), FrogNet filed its memorandum in opposition (ECF No. 120), and Verizon filed its reply brief (ECF No. 121). For the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART** Verizon's motion for reconsideration and **FINDS IN FAVOR** of Verizon on FrogNet's intentional interference with business relationships counterclaim.

# I. Background

The parties in this case provide internet services to individual and commercial consumers. Insofar as this suit is concerned, internet services can be provided to consumers in either a retail or a wholesale model. In a retail model, a consumer must contract separately with an internet service provider ("ISP") for internet service and with a telephone company for the digital subscriber line ("DSL") over which that internet service will be carried. In a wholesale model, a consumer need only contract with the ISP for both the internet service and the DSL telephone lines; the ISP then contracts directly with the telephone company for the consumer's DSL telephone lines and passes that cost on to the consumer. FrogNet is an ISP based in Athens, Ohio. Verizon provided DSL telephone lines to FrogNet's customers.

FrogNet had customers in the Columbus, Ohio area, which was its home Local Access and Transport Area ("LATA"), LATA 324, as well as in other LATAs in Ohio. In late 2002, Verizon informed FrogNet that it would no longer be permitted to sign-up new customers outside of its home LATA unless it established a point of presence ("POP") in that LATA. A POP is a physical location somewhere in the LATA where FrogNet would establish a host connection. Establishment of a POP would also require FrogNet to acquire new equipment.

On October 19, 2005, Verizon filed this action alleging breach of contract, accounting, and unjust enrichment based upon FrogNet's alleged failure to pay for services Verizon delivered. Verizon alleged that FrogNet owed it $180,564.06 as of April 1, 2005. (ECF No. 1.) Verizon also filed a claim for defamation. On May 1, 2006, FrogNet filed counterclaims for breach of contract, intentional interference with business relationships, negligence, and defamation. (ECF No. 17.) This case was assigned to the Honorable John D. Holschuh.

On July 31, 2009, Verizon moved for summary judgment on all of FrogNet's counterclaims. (ECF No. 64.) On April 2, 2010, Judge Holschuh granted Verizon's motion on all of the counterclaims except intentional interference with business relationships. (ECF No. 79.)

On December 30, 2010, Judge Holschuh recused himself from this case and it was randomly assigned to the undersigned judge. (ECF No. 95.) After holding a status conference with the parties (ECF No. 96), this Court scheduled a bench trial for May 2, 2011 (ECF No. 98).

On April 29, 2011, counsel for FrogNet moved to withdraw, informing the Court of a serious personal situation which prevented him from continuing his representation. (ECF No. 103.) The Court granted defense counsel's request. (ECF No. 104.)

On May 19, 2011, new counsel for FrogNet filed his notice of appearance in this action. (ECF No. 108.) The following day the Court scheduled a status conference (ECF No. 109), which was held on June 28, 2011. The Court re-scheduled the bench trial for October 11, 2011. (ECF No. 110.)

This matter was tried to the Court on October 11, 2010 and October 12, 2010. At the conclusion of Verizon's case-in-chief, the Court granted FrogNet's request for judgment as a matter of law on Verizon's breach of contract, unjust enrichment and accounting claims. Verizon has moved for reconsideration of that decision. (ECF No. 117.) That motion is ripe for review.

At the conclusion of the bench trial, the Court took FrogNet's counterclaim under advisement.

## II. Stipulations

The parties entered into and filed with the Court the following stipulations:

1) In December 2000, FrogNet inquired to Verizon about the ability to provide wholesale DSL service to its customers. (Joint Ex. 13.) Prior to December 2000, FrogNet had been providing retail DSL service to its customers.

2) On June 19, 2001, FrogNet and Verizon entered into the Infospeed DSL Solutions Term and Volume Discount Program Purchase Agreement (the "DSL Agreement"). (Joint Ex. 1.)

3) The DSL Agreement permitted FrogNet to resell DSL service to its customers on a wholesale basis.

4) The DSL Agreement was for a period of five years, or until June 2006. (Joint Ex. 1, p. 1.)

5) FrogNet's DSL Agreement was also subject to all terms in the applicable tariff, which the parties agree is provided to the Court as Joint Exhibit 2.

6) In February 2003, FrogNet requested to transition its wholesale customers to the retail model.

7) The parties agree that the following exhibits are true and accurate copies of communications that were exchanged between the parties, and admissible at trial:

> a. February 26, 2003 email correspondence from FrogNet's Chief Financial Officer, Jessica Maguire, to John Sutton. (Joint Ex. 3.)

> b. March 27, 2003 email correspondence from FrogNet's Chief Financial Officer, Jessica Maguire, to John Sutton. (Joint Ex. 4.)

> c. April 4, 2003 email correspondence from John Sutton to Jessica Maguire. (Joint Ex. 5.)

> d. April 8, 2003 email correspondence from Jessica Maguire to John Sutton. (Joint Ex. 6.)

8) FrogNet and Verizon agreed to a payment plan in February 2003 that would have brought FrogNet's DSL accounts current. (Joint Ex. 3.) The payment plan required four monthly installments of $12,373.94. (Joint Ex. 3.)

9) The parties agree that the following exhibits are true and accurate copies of

communications that were exchanged between the parties, and admissible at trial:

a. April 18, 2003 email correspondence from FrogNet's counsel, Mary Christensen to John Cullina, Verizon representative. (Joint Ex. 7.)

b. Undated email correspondence from John Cullina to Mary Christensen, responding to April 18, 2003 email. (Joint Ex. 8.)

c. April 21, 2003 email correspondence from Mary Christensen to John Cullina. (Joint Ex. 9.)

d. May 6, 2003 email correspondence from Mary Christensen to John Cullina. (Joint Ex. 10.)

e. May 6, 2003 email correspondence from John Cullina to Mary Christensen. (Joint Ex. 11.)

f. May 6, 2003 email correspondence from Mary Christensen to John Cullina. (Joint Ex. 14.)

g. May 7, 2003 email correspondence from John Cullina to Mary Christensen. (Joint Ex. 15.)

h. May 14, 2003 email correspondence from John Cullina to Mary Christensen. (Joint Ex. 16.)

i. May 14, 2003 email correspondence from Mary Christensen to John Cullina. (Joint Ex. 17.)

j. May 23, 2003 email correspondence from John Cullina to Mary Christensen. (Joint Ex. 18.)

k. May 23, 2003 email correspondence from Mary Christensen to John Cullina. (Joint Ex. 19.)

l. May 23, 2003 email correspondence from John Cullina to Mary Christensen. (Joint Ex. 20.)

(ECF No. 102 at 1-3.)

### III. Bench Trial

The trial in this action was scheduled for two days. At approximately 8:00 p.m. on the

second day, the parties had not yet presented their closing arguments.  Because the Court's

schedule did not permit it to continue the trial a third day, the Court decided to permit the parties

to make their closing arguments in a post trial brief, which both parties timely filed.  (ECF Nos.

116, 118.)

## A.  Witness Summaries

During the two day trial of this action, the parties presented a total of five witnesses.

### 1.  John Sutton

Verizon called John Sutton in its case-in-chief and as its first witness after FrogNet's

case-in-chief.  Mr. Sutton is currently a Revenue Assurance Supervisor for Verizon

Telecommunications and has worked for Verizon entities since 2001.  From 2001 through 2005

he worked for VADI.  He was an access order representative and billing collector during that

time.  FrogNet was one of the thirteen accounts Mr. Sutton oversaw;  handling payments, past

due accounts, and any disputes that arose.  He testified about overseeing FrogNet's account and

his interaction with certain individuals at FrogNet.

### 2.  Charles ("Chip") McIntosh

In its case-in-chief, Verizon called Chip McIntosh, FrogNet's President and Chief

Executive Officer ("CEO") as if on cross examination.  Mr. McIntosh testified about the

business relationship between FrogNet and Verizon.  He testified specifically about the payment

plan agreement entered into by FrogNet and Verizon in late February or early March 2003,

which was designed to allow FrogNet to pay the past due amounts it owed to Verizon.  Mr.

McIntosh testified about the number of customers FrogNet had, the services provided to those

customers and the actions Verison took that he believed tortiously interfered with FrogNet's

relationship with those customers.  He testified as to how he determined the value he assigned to the customers to calculate the damages he claims Verizon caused FrogNet by interfering with FrogNet's relationships with those customers.

### 3. Jacquelyn Cole

FrogNet called Jacquelyn Cole as a witness in its case-in-chief.  Ms. Cole is a FrogNet customer.  She testified about her experiences with FrogNet and with Verizon and her satisfaction and/or dissatisfaction with the service each provided to her.

### 4. Toby Lawrence

FrogNet called Toby Lawrence as a witness during its case-in-chief.  Ms. Lawrence was an employee of FrogNet from October 2001 through May 2006.  Ms. Lawrence began her employment as a technical support representative, was promoted to a manager and was promoted again to Director of Customer Support.  Ms. Lawrence testified about her job duties and her dealings with Verizon on behalf of FrogNet.  She testified about the type of services FrogNet provided to its customers and the location of those customers.

### 5. John Schommer

Verizon called John Schommer as a witness after FrogNet presented its case-in-chief.  Mr. Schommer is the Director of Broadband Product Development at Verizon and has been employed by a Verizon company for approximately 25 years.  He testified about his positions at Verizon and its predecessor company and explained the requirements of his current position at Verizon.  He testified about his understanding of what federal law and the Federal Communications Commission ("FCC") requires for providers of internet service.  He explained how Verizon became aware that FrogNet was providing services outside of its home LATA

without a POP and his understanding that FrogNet could not provide those services without a POP.

## B.  Verizon's Claims

At the final pretrial conference, Verizon indicated that it would not be pursuing its defamation claim.  Thus, before the Court at trial was Verizon's breach of contract, unjust enrichment and accounting claims.  In Verizon's case-in-chief, it called as witnesses Verizon Revenue Assurance Supervisor John Sutton and as if on cross examination FrogNet President and CEO Chip McIntosh.  Verizon claims that based upon the testimony of these witnesses, Verizon proved that there was a contract between VADI and FrogNet, that FrogNet did not stay current on the amount that it owed to VADI for its services, that the parties entered into an accord and satisfaction as to disputed charges, that FrogNet continued to receive from Verizon and delivered to its customers the Verizon DSL service until the termination of the contract, that FrogNet continued to invoice its customers while not paying Verizon, and that FrogNet paid only $5,000 from the time of the accord and satisfaction forward.

### 1.  Standards

The parties agree that Virginia law governs their contract dispute.  (ECF No. 79 at 13.) Under Virginia law, "[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."  *Filak v. George*, 267 Va. 612, 619 (2004) (citing *Brown v. Harms*, 251 Va. 301, 306 (1996); *Fried v. Smith*, 244 Va. 355, 358 (1992); *Westminster Investing Corp. v. Lamps Unlimited, Inc.*, 237 Va. 543, 546 (1989)).  "To state a cause of action for unjust enrichment, [a plaintiff must] allege that: (1) he

conferred a benefit on [the defendant]; (2) [the defendant] knew of the benefit and should reasonably have expected to repay [the plaintiff]; and (3) [the defendant] accepted or retained the benefit without paying for its value." *Schmidt v. Household Fin. Corp., II*, 276 Va. 108, 116 (2008) (citing *Nedrich v. Jones*, 245 Va. 465, 476 (1993)).

### 2. Judgment as a Matter of Law

At the close of Verizon's case-in-chief, FrogNet moved for judgment as a matter of law on Verizon's claims. Counsel for FrogNet argued that the evidence before the Court suggested that VADI, the entity that contracted with FrogNet, merged with another company or sold its assets and liabilities to another company. Counsel argued that Verizon had an affirmative obligation to show the trier of fact that it currently owned the debt upon which it sued and that Verizon had failed to meet that burden.

This Court found FrogNet's motion well taken. The Court accepted FrogNet's counsel's argument that Verizon had the burden of showing it currently owned the account upon which it sued. It was undisputed that Verizon was unable to make such a showing at the trial.

### C. FrogNet's Counterclaim

The only counterclaim that survived Verizon's motion for summary judgment is FrogNet's tortious interference with business relationships claim. In FrogNet's case-in-chief, it called as witnesses former FrogNet employee Toby Lawrence, FrogNet President and CEO Chip McIntosh, FrogNet customer Jackie Cole; Verizon called as witnesses Verizon Revenue Assurance Supervisor John Sutton and Director of Broadband Product Development John Schommer.

FrogNet claims that Verizon interfered in FrogNet's business when Verizon: "(1) cut off

existing FrogNet customers' service; (2) refused to offer assistance to FrogNet's existing

customers; and (3) refused to permit FrogNet to continue to expand its ISP business outside of

the Columbus LATA."  (ECF No. 118 at 1.)

### 1. Standard

 The tort of interference with a business relationship occurs "when a person, without a

privilege to do so, induces or otherwise purposely causes a third person not to enter into or

continue a business relation with another, or not to perform a contract with another."  *A &*

*B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St. 3d 1,

14 (1995) (citations omitted).  To succeed on a claim for tortious or intentional interference with

a business relationship, a plaintiff must show: (1) a business relationship; (2) the tortfeasor's

knowledge thereof; (3) an intentional interference causing a breach or termination of the

relationship; and (4) damages resulting therefrom.  *Chandler & Assoc., Inc. v. America's*

*Healthcare Alliance, Inc.*, 125 Ohio App. 3d 572, 583 (Ohio Ct. App. 1997).

### 2. Findings of Fact and Conclusions of Law

FrogNet argues in its closing brief that it has proven by a preponderance of the evidence

that Verizon intentionally interfered with FrogNet's business relationships with its customers.

FrogNet claims that it has shown intentionality by establishing that:

> Verizon agreed to permit FrogNet to migrate all of its wholesale customers to the retail
> model, and then Verizon promptly reneged.  Verizon required FrogNet to escrow disputed
> billing amounts as a condition to keeping its customers, a condition Verizon's own witness
> testified he had never before seen in practice.  Finally, Verizon told FrogNet that if it wanted
> to solicit new customers outside of the Columbus LATA, FrogNet had to establish a physical
> point of presence [POP] within each individual LATA in Ohio.

(ECF No. 118 at 4.)  Verizon's behavior, FrogNet claims, took place in "Spring 2003 – just

before the point when Verizon could first operate as an ISP and sell DSL direct to consumers in

Ohio[.]"  (ECF No. 118 at 4.)

Based upon the evidence presented at trial, the Court finds that FrogNet failed to

establish intentionality.  The evidence overwhelmingly showed that Verizon lacked the requisite

intent to interfere with FrogNet's customers because: (a) Verizon had been in the retail DSL

market since the late 1990s, (b) Verizon made a business decision to discontinue providing

services to FrogNet because FrogNet was delinquent in paying for Verizon's services, and (c)

Verizon changed the requirements for FrogNet to provide ISP service outside the Columbus

LATA based on a legitimate business reason.

### a.  Verizon had been in the retail DSL market since the late 1990s

FrogNet argues that Verizon was permitted for the first time to enter the Ohio retail DSL

market in Spring 2003.  FrogNet believes that this change in opportunity for Verizon prompted it

to interfere with FrogNet's DSL customers.  In its closing brief, FrogNet states:

> When Verizon was first beginning to operate as an ISP in Ohio, Verizon
> chose to kill FrogNet rather than compete on the merits.  As Judge Holschuh found
> on summary judgment, the evidence "tends to suggest that Verizon may have been
> attempting to keep FrogNet from growing" at the time Verizon "was about to begin
> providing DSL service in Ohio."

(ECF No. 118 at 10.)

The evidence before the Court, however, showed that Verizon was not "first beginning to

operate as an ISP in Ohio" at the time FrogNet claims.  At trial, FrogNet CEO Chip McIntosh

testified that he believed that Verizon was permitted for the first time to enter the Ohio retail

DSL market as an ISP at the relevant time period but did not offer any explanation as to why he

believed this to be so.  Verizon presented Director of Broadband Product Development John

Schommer, who testified that Verizon did not first begin to operate as an ISP in Ohio in 2003,

but instead had been in the Ohio retail DSL business continuously since the late 1990s. Mr. Schommer was employed in the Verizon DSL internet operation during the 1990s. Unlike Mr. McIntosh, Mr. Schommer had first-hand knowledge of the business activities of Verizon. The Court found Mr. Schommer to be a believable witness and his testimony in this regard was credible. Moreover, the testimony was unchallenged. Thus, FrogNet's belief that in the Spring of 2003 Verizon was permitted for the first time to sell DSL direct to consumers in Ohio as an ISP is factually inaccurate and certainly could provide no impetus for Verizon to interfere with FrogNet's business relationship with its customers.

With regard to Plaintiffs' reliance on Judge Holschuh's opinion, that reliance is misplaced. In his Opinion and Order on summary judgment, Judge Holshuh relied entirely on Mr. McIntosh's testimony. As the Court just explained, that testimony has been successfully challenged and shown to be based upon factually inaccurate information.

### b. FrogNet's delinquent payments

The evidence at trial showed that FrogNet and Verizon entered into a payment plan agreement that required FrogNet to pay four $12,000 payments at 30-day intervals to satisfy FrogNet's outstanding debt owed to Verizon. FrogNet CEO Chip McIntosh testified that FrogNet owed $ 48,000 in past due invoices to Verizon and that FrogNet intended to pay it. Both parties also agreed that the payment plan called for FrogNet to stay current on payments on its wholesale accounts with Verizon. Finally, the evidence indicated that the applicable tariff permitted Verizon to terminate its service to FrogNet for nonpayment.

Mr. McIntosh testified FrogNet's agreement to pay the past due amounts was contingent upon Verizon effecting a migration of FrogNet's customers from wholesale to retail and that if

that migration did not take place, FrogNet could not satisfy its delinquent debt. Even if this Court were to believe Mr. McIntosh's testimony, however, it does not provide any excuse for FrogNet's failure to stay current on its wholesale accounts. Mr. McIntosh testified that FrogNet collected money from its customers for the services provided by Verizon and yet failed to pay any of that amount to Verizon.

Verizon Revenue Assurance Supervisor John Sutton and Director of Broadband Product Development John Schommer both explained that once Verizon migrated FrogNet's customers to retail, Verizon would lose all leverage to obtain the amount due from FrogNet. That is, when FrogNet was providing wholesale services, Verizon's customer was FrogNet. Verizon could, and did, threaten FrogNet with an interruption of service if FrogNet failed to pay for the services provided by Verizon. When FrogNet switched to the retail model, Verizon's customer was the end user. There would no longer be any financial or business relationship between Verizon and FrogNet. Thus, Verizon would lose all leverage it previously had with FrogNet. Verizon's decision not to permit FrogNet to migrate its wholesale customers to retail was nothing more than a reasonable business decision.

FrogNet makes much of the fact that after it failed to pay Verizon the agreed-upon payments, Verizon tried to renegotiate the payment agreement so that FrogNet had to escrow certain disputed billing amounts as a condition to keeping service, "a condition Verizon's own witness testified he had never before seen in practice." (ECF No. 118.) The witness to whom FrogNet refers is Mr. Sutton, who testified that he had never seen such a deal but that he had also never had any contact with an ISP that was as seriously delinquent as was FrogNet. Indeed, Mr. Sutton recorded his frustrations with FrogNet's delinquency in real time in 2003 as reflected in

Plaintiffs' Exhibit 7 ("I personally feel that the customer either needs to pay the amount shown, or we need to cut our losses now."). Mr. Sutton was a believable witness whose testimony in this regard the Court found to be credible.

The Court concludes that Verizon had significant business reasons to end its relationship with FrogNet. And, as Verizon correctly points out, Ohio "highly values competitive enterprise," and Ohio courts will not allow a plaintiff's tortious interference claim to withstand when there are "significant business reasons" for a defendant's allegedly tortious conduct as opposed to improper motive. *See Kand Med., Inc. v. Freund Med. Prods., Inc.*, 963 F.2d 125, 129 (6th Cir. 1992) ("simply an intent to advance [one's] own commercial and economic position" is not tortious; "[t]here is no evidence in the record of improper purpose or motive on Kand's part, only that Kand had significant business reasons for its conduct").

### c. Verizon's reason for requiring a POP

It is not disputed that Verizon had permitted FrogNet to provide ISP service outside the Columbus LATA without a POP. It is also undisputed that FrogNet, or any ISP, could obtain its POP from any provider it chose. In other words, FrogNet was not required to purchase and or lease the necessary elements of a POP from Verizon. FrogNet claims that Verizon's motive in subjecting FrogNet to this new restriction was to interfere with FrogNet's current and prospective customers. FrogNet, in its closing brief, argues that federal law contains no such restriction, that even if federal law did contain such a restriction it was not the basis for FrogNet's action, and that Verizon should be estopped from relying on this alleged prohibition.

### i. Requirements of federal law

FrogNet argues that federal law does not require an ISP to possess a POP within a LATA

in order to provide service in that LATA. That argument, however, is of no moment in this analysis. Whether federal law requires an ISP to possess a POP in any LATA in which it provides service does not inform the Court on Verizon's intent. As to that inquiry, Director of Broadband Product Development John Schommer testified about the measures Verizon took to comply with federal law. He testified that he and several other employees of Verizon were tasked with analyzing federal regulations and federal courts' interpretations of those regulations. He explained that it was Verizon's understanding that the law required an ISP to possess a POP in any LATA in which it provides service. Mr. Schommer's testimony was credible on this point.

### ii. Verizon's intent

FrogNet argues that "[e]ven if Verizon somehow believed that inter-LATA service required a point of presence under federal law, that did not form the basis for Verizon's intent." (ECF No. 118 at 6.) FrogNet bases this claim on two contentions.

First, FrogNet claims that "had Verizon actually believed that the law prohibited inter-LATA sales, it would have pled illegality as an affirmative defense in its answer to the counterclaim, and it would have moved for summary judgment on this ground." *Id.* This argument, however, does nothing to inform the Court as to Verizon's intent and, instead, merely critiques Verizon's litigation strategy or lack of strategy as the case may be.

Second, FrogNet argues that Verizon's offer to permit "FrogNet to continue service for existing (or "grandfathered") inter-LATA customers [is] clear evidence that it did not truly believe its conduct was inhibited by the alleged laws at play." *Id.* FrogNet contends:

> By selectively permitting FrogNet to 'grandfather' inter-LATA customers but refusing to allow FrogNet to solicit new customers, Verizon was actively choosing

> when to ignore or follow federal law.  If Verizon's true motive was to comply with federal law, *it would have done so.*  Instead, Verizon's sworn testimony is that it chose to ignore federal law when it was in Verizon's best interest to do so.   And more importantly, Verizon chose to comply with the law only when it hurt FrogNet's current and prospective business relationships.

(ECF No. 118 at 6-7) (emphasis in original).

Based on the evidence presented at trial, this Court disagrees with FrogNet's assessment of Verizon's offer to grandfather FrogNet's existing inter-LATA customers.  Director of Broadband Product Development John Schommer explained in detail the legal genesis of the communication to FrogNet that Verizon could not transmit FrogNet's data traffic across LATA borders.  In this testimony, as in all of the testimony elicited from him, Mr. Schommer was absolutely credible.  Nothing about the examination or cross examination of Mr. Schommer caused this Court any concern as to the veracity of his testimony.  In especially relevant part, Mr. Schommer explained that it was he who discovered that Verizon was conveying FrogNet data traffic across LATA boundaries when he believed it was illegal to do so.  He explained that he discovered this accidentally, as part of an unrelated capacity study.  FrogNet, Mr. Schommer testified, was the only ISP doing business with Verizon that was engaging in this type of inter-LATA traffic without a POP.  Immediately upon discovering the error, he blew the whistle on his own department.  Mr. Schommer testified that Verizon's decision to permit FrogNet to grandfather the existing inter-LATA customers despite federal law is the same decision the FCC would have made under the circumstances.  This decision, contrary to FrogNet's assessment of it, is inconsistent with any intent to damage FrogNet.

### iii.  Estoppel

Last, FrogNet argues that Verizon should be estopped from relying on its belief that the

inter-LATA traffic from which it prohibited FrogNet from engaging was illegal. FrogNet

contends that once Verizon "chose a course of illegal conduct, Verizon is estopped from now

claiming that it intended to follow the law as a defense to FrogNet's interference claim." (ECF

No. 118 at 8.) Verizon, however, is not claiming that it intended to follow the law as a defense

to FrogNet's interference claim. Instead, Verizon merely explains its actions so that this Court

can determine whether Verizon intentionally interfered with FrogNet's business relationships. In

that vein, Verizon presented testimony from Mr. Schommer regarding why Verizon made the

decisions it made relating to inter-LATA traffic. Estoppel simply does not apply to these

circumstances.

### c. Conclusion - findings of fact and conclusions of law

The Court concludes that FrogNet failed to prove by a preponderance of the evidence that

Verizon intentionally interfered with its business relationships.

### 3. Verizon's Motion for Judgment as a Matter of Law

At the close of FrogNet's case-in-chief, Verizon moved for judgment as a matter of law,

which the Court denied.

### IV. Verizon's Motion for Reconsideration

Verizon has moved for reconsideration of the Court's decision to grant FrogNet's motion

for judgment as a matter of law on Verizon's breach of contract and unjust enrichment claims.

Verizon requests that this Court withdraw its decision, enter judgment in Verizon's favor on its

claims, and award it damages in the amount of $259,309.75 or $243,135.15, dependent upon the

Court's determination as to the amount of the payment plan agreement.[1]  FrogNet argues that this Court should not withdraw its decision granting them judgment as a matter of law on Verizon's claims but that if the Court does withdraw it, the Court should reopen the trial so that FrogNet is permitted to put on its defense to those claims.

## A.  Standard

Although the Federal Rules of Civil Procedure do not explicitly address motions for reconsideration of interlocutory orders, the authority for a district court to hear such motions is found in both the common law and in Rule 54(b) of the Federal Rules of Civil Procedure. *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 Fed. Appx. 949, 959 (6th Cir.  2004) *Rodriguez,* 89 Fed. Appx. at 959.  A district court's authority to reconsider its previous orders has been recognized to afford such relief as justice requires.  *Id.* 952.  Traditionally, courts will find justification for reconsidering orders entered before final judgment is entered when there is (1) an intervening change of controlling law; (2) new evidence available; or, (3) a need to correct a clear error or prevent manifest injustice.  *Id.* (citing *Reich v. Hall Holding Co.*, 990 F. Supp. 955, 965 (N.D. Ohio 1998)).  *See also Cohn v. United States*, 259 F.2d 371, 376 (6th Cir. 1958) ("Until the entry of its judgment disposing of the litigation, such [federal district] court has the inherent power to correct any error of its own which it may have previously made in its handling of the case.").

## B.  Reconsideration of its Decision

Verizon argues that the Court erred in relying upon FrogNet's legal argument that even

---

[1]Plaintiff's Exhibit 5 shows a payment plan amount that is different from the amount identified in the parties' stipulations, set out *supra*.

though Verizon was the proper plaintiff at the commencement of the litigation, Verizon had to prove that it owned the claims at the time of trial to prevail on them. Verizon claims that it does currently own FrogNet's debt but that it was simply not prepared to show that it owned the debt at trial because current ownership of a claim is not an element or a matter a plaintiff must prove to the trier of fact in a breach of contract and/or unjust enrichment claim. Instead, Verizon asserts that a plaintiff may continue its action even if it transfers its interest in the litigation to another party, unless as a matter of substantive law, the claims extinguish upon transfer, which Verizon's claims did not. Verizon relies Federal Rule of Civil Procedure 25(c), which provides that "[i]f an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party."

FrogNet makes two arguments against Verizon's position. First, it argues that Rule 25 is a procedural device which allows a party to request that a court direct substitution of a new party when an original party to an action has transferred its interest. The Rule, FrogNet continues, does not determine what actions survive a transfer of interest by a party, but instead only deals with the mechanics of substitution in an action which does survive under applicable substantive law. FrogNet's statement regarding Rule 25(c) is accurate. However, the statement does nothing to rebut Verizon's contention that it was not required to prove that it owned the FrogNet debt at the time of trial but instead remained the proper party to prosecute its claims against FrogNet regardless of whether or not it had sold the debt. Indeed, both Verizon and FrogNet recognize that under Rule 25(c) a party can, but need not, file a motion requesting a court to order that the transferee to be substituted in the action or joined with the original party or the

action may be continued by or against the original party. As the United States Court of Appeals for the Eighth Circuit has explained in a case in which it reversed the district court, reasoning that it improperly found that the transfer extinguished the plaintiff's cause of action:

> The district court erroneously determined that Rule 25(c) only applies if, as a matter of substantive law, the original plaintiff retains a cause of action against the defendant after the transfer of interest . . . . The rule expressly permits parties to continue in an action, even if they do not remain the real party in interest, as long as the cause of action itself survives the transfer to the new party.

*ELCA Enters. v. Sisco Equip. Rental & Sales*, 53 F.3d 186, 191 (8th Cir. 1995). The circuit court explained that "[t]he rule is 'designed to allow an action to continue unabated when an interest in a lawsuit changes hands,' rather than requiring the initiation of an entirely new lawsuit." *Id.* (citing *General Battery Corp. v. Globe-Union, Inc.*, 100 F.R.D. 258, 261 (D. Del. 1982)). *See also Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150, 153-54 (6th Cir. 1992) (disagreeing with the defendant's contention that the plaintiff must "prove that it owns the cause of action asserted in this suit"); 6A Charles A. Wright et al., Federal Practice and Procedure: Civil 2D § 1958, at 555 (1990) ("The most significant feature of Rule 25(c) is that it does not require that anything be done after an interest has been transferred. The action may be continued by or against the original party, and the judgment will be binding on his successor in interest even though he is not named.").

The issue then becomes whether Verizon's claims survive a transfer of interest or whether they are extinguished upon transfer. FrogNet makes no argument that Versizon's claims do not survive a transfer of interest. It is easily understood why: if Verizon's claims were transferred, those claims would certainly survive transfer. It is common business practice to assign contract rights to another and it is statutorily permitted in Virginia, the law applicable to

Verizon's breach of contract/unjust enrichment claims.  *See* Va. Code § 8.01-13 (absent an agreement otherwise, an assignee of a contract "may maintain thereon in his own name any action which the original obligee, payee, or contracting party might have brought . . . ."); *see also Dallman Acquisition, LLC v. Dallman*, No. 2:10-CIV-007, 2011 U.S. Dist. LEXIS 20138, at *3 (S.D. Ohio Mar. 1, 2011) (assignee filed and prosecuted claim for breach of contract entered into by assignor).  Indeed, breach of contract and unjust enrichment claims are of a different nature than claims such as defamation that are incapable of conveyance.

As to FrogNet's second argument, it claims that "this case is not one contemplated by the spirit and purpose of Rule 25(c).  As discussed above, the purpose of Rule 25(c) is to prevent defendants from playing hot potato with assets at issue."  (ECF No. 120 at 6) (relying on *Maldonado v. Valsyn S.A.*, 434 F. Supp. 2d 90, 91-92 (D. P.R. 2006), which stated that the purpose of Rule 25(c) "is to prevent that assets, which are subject to litigation, be transferred to a third party, allowing a defendant to sabotage plaintiffs' efforts of reaching the assets should liability on defendant attach).  Verizon argues in reply that, by its very terms, Rule 25(c) applies to a plaintiff's transfer of interests, including its assignment or transfer of assets, and that numerous courts have applied the Rule in the context of transfer from one claimant to another. Plaintiff is correct.  *See* Fed. R. Civ. P. 25(c) (providing that in the event that an "interest is transferred," the action may be continued *"by or against the original party"*) (emphasis added); *ELCA Enters.*, 53 F.3d at 191 (concluding that trial court improperly entered judgment against the plaintiff that transferred its interest in litigation while the matter was pending, and reasoning that, by dismissing plaintiffs' claims and refusing to allow the transferee to be substituted, the court "essentially punished the plaintiff and rewarded the defendants for ELCA's transfer of the

property"); *Froning's, Inc. v. Johnston Feed Serv., Inc.*, 568 F.2d 108, 110 (8th Cir. 1978) (reasoning that, where plaintiff transfers its interest during litigation, "[i]n the absence of such a motion [to substitute the parties] it is not error to continue the action in the name of the original parties"); *Pacamor Bearings, Inc. v. Minebea Co.*, 892 F. Supp. 347, 360 (D.N.H. 1995) (" 'Rule 25(c) is not designed to create new relationships among parties to a suit but is designed to allow the action to continue unabated when an interest in the lawsuit changes hands.' ") (citation omitted); *Heisinger v. CJ Ventures*, LLC, No. 08-CV-4027, 21 Am. Disabilities Cas. (BNA) 1793, 2009 U.S. Dist. LEXIS 25886, at *14 (D. S.D. Mar. 24, 2009) (allowing substitution of the plaintiff, reasoning that the purpose of Rule 25(c) is "to allow an action to continue unabated when an interest in a lawsuit changes hands" (internal quotation omitted)); *Luken v. Int'l Yacht Council, Ltd.*, No. 02-CV-60772, 2007 U.S. Dist. LEXIS 83651, at *17-18 (S.D. Fla. Nov. 12, 2007) (allowing original plaintiff that transferred interest in litigation to continue as party to litigation after transfer of interest occurred); *Kraebel v. New York City Dep't of Housing Preservation & Develop.*, No. 90-CV-4391, 2002 U.S. Dist. LEXIS 71, at *12-14 (S.D. N.Y. Jan. 3, 2002) (allowing original plaintiff to maintain action despite sale of subject matter of lawsuit; "Rule 25(c) makes plain that when a transfer of interest occurs the case continues seamlessly making substitution unnecessary.").

Accordingly, the Court concludes that it improvidently granted FrogNet's motion for judgment as a matter of law on Verizon's breach of contract and unjust enrichment claims. The Court, therefore, **GRANTS** Verizon's Motion for Reconsideration to the extent that it requests the Court to withdraw its decision granting FrogNet's motion.

## C.  Reopening the Trial

Verizon argues that at trial it proved its claims and that FrogNet had sufficient opportunity to present its defense.  Therefore, Verizon requests that the Court enter judgment in its favor and award it damages.  The Court, however, finds that it would be manifestly unfair to find in favor of Verizon before FrogNet is permitted to put on its defense.  Accordingly, the Court **DENIES** Verizon's Motion for Reconsideration to the extent that it requests a ruling in its favor and an award of damages.

## V.  Conclusion

For the reasons set forth above, the Court **RULES IN FAVOR** of Verizon on FrogNet's intentional interference with business relationships counterclaim and **GRANTS IN PART AND DENIES IN PART** Verizon's motion for reconsideration.  Specifically, the Court **GRANTS** the motion to the extent that it requests that the Court withdraw its decision to grant FrogNet judgment as a matter of law on Verizon's breach of contract and unjust enrichment claims and **DENIES** the motion to the extent that it requests the Court to enter judgment in its favor on those claims and award it damages.  The Court shall schedule a conference to address the reopening of the trial so that FrogNet may provide a defense to Verizon's claims.

**IT IS SO ORDERED.**

> **/s/ Gregory L. Frost**
> **GREGORY L. FROST**
> **UNITED STATES DISTRICT JUDGE**